# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### LAFAYETTE DIVISION

ROCKY T. HOPKINS,      )
                       )
     Plaintiff,      )
                       )
     v.                )     CAUSE NO.: 4:17-CV-36-TLS
                       )
NANCY A. BERRYHILL,      )
ACTING COMMISSIONER OF THE      )
SOCIAL SECURITY      )
ADMINISTRATION,      )
                       )
     Defendant.      )

## OPINION AND ORDER

The Plaintiff, Rocky T. Hopkins, seeks review of the final decision of the Commissioner of the Social Security Administration denying his application for Disability Insurance Benefits. The Plaintiff argues that the Commissioner erred by: (1) failing to include limitations from all impairments in her hypothetical to the vocational expert; and (2) failing to properly weigh the opinion evidence of the consultative examiner. For the reasons set forth below, the Court REVERSES and REMANDS this case for further proceedings in accordance with this Opinion and Order.

## BACKGROUND

On March 14, 2014, the Plaintiff filed an application for Disability Insurance Benefits under Title II of the Social Security Act, 42 U.S.C. § 423(d), as well as an application for Supplemental Security Income under Title XVI of the Social Security Act, 42 U.S.C. § 1382c(a)(3), alleging disability beginning December 6, 2012. (R. 208–20.) His claims were denied initially on May 23, 2014, and upon reconsideration on August 21, 2014. (R. 125–32,

138–44.) An administrative law judge (ALJ) conducted a video hearing on February 9, 2016, during which the Plaintiff—who was represented by an attorney—and a vocational expert (VE) testified. (R. 16–55.) On April 15, 2016, the ALJ issued a partially favorable decision, finding that the Plaintiff was disabled for purposes of Supplemental Security Income beginning on April 26, 2014, but that he was not disabled prior to that date for purposes of Disability Insurance Benefits through December 31, 2013, the date last insured. (R. 109–20.) On March 1, 2017, the ALJ's decision became the final decision of the Commissioner when the Appeals Council denied the Plaintiff's request for review. (R. 1–6.) The Plaintiff filed this claim in federal court against the Acting Commissioner of the Social Security Administration on May 4, 2017 [ECF No. 1].

## THE ALJ'S FINDINGS

Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). To be found disabled, a claimant must demonstrate that his physical or mental limitations prevent him from doing not only his previous work, but also any other kind of gainful employment that exists in the national economy, considering his age, education, and work experience. §§ 423(d)(2)(A), 1382c(a)(3)(B). With respect to a Title II claim for Disability Insurance Benefits, a claimant must also meet the insured status requirements of the Social Security Act. In this case, the ALJ determined that the "claimant has acquired sufficient quarters of coverage to remain insured through December 31, 2013." (R. 109.)

An ALJ conducts a five-step inquiry in deciding whether to grant or deny benefits. 20 C.F.R. §§ 404.1520, 416.920. The first step is to determine whether the claimant no longer engages in substantial gainful activity (SGA). *Id.* In the case at hand, the ALJ found that the Plaintiff had not engaged in SGA since his alleged onset date of December 6, 2012. (R. 112.)

At step two, the ALJ determines whether the claimant has a severe impairment or combination of impairments that limit his ability to do basic work activities under §§ 404.1520(c) and 416.920(c). The ALJ determined that, since the alleged onset date of December 6, 2012, the Plaintiff had severe impairments of chronic obstructive pulmonary disease, emphysema, loss of vision in the right eye, and left knee pain status-post tibial plateau fracture. (R. 112.) However, the ALJ found that the Plaintiff's anxiety and history of alcohol abuse were non-severe. (*Id.*)

Step three requires the ALJ to "consider the medical severity of [the] impairment" to determine whether the impairment "meets or equals one of [the] listings in appendix 1 . . . ." §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). If a claimant's impairment(s), considered singly or in combination with other impairments, rise to this level, there is a presumption of disability "without considering [the claimant's] age, education, and work experience." §§ 404.1520(d), 416.920(d). But, if the impairment(s), either singly or in combination, fall short, the ALJ must proceed to step four and examine the claimant's "residual functional capacity" (RFC)—the types of things he can still do physically, despite his limitations—to determine whether he can perform "past relevant work," §§ 404.1520(a)(4)(iv), 416.920(A)(4)(iv), or whether the claimant can "make an adjustment to other work" given the claimant's "age, education, and work experience," §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). Here, the ALJ assessed the Plaintiff's RFC based on two separate time periods—prior to and post April 26, 2014, the date the ALJ determined the

Plaintiff became disabled. Prior to April 26, 2014, the ALJ determined that the Plaintiff had the RFC to perform "medium work as defined in 20 CFR 404.1567(c) and 416.967(c), with an additional limitation, meaning he was limited to jobs that could be performed with monocular vision." (R. 114.) Beginning on that date, however, the ALJ found that the Plaintiff had the RFC to perform:

> light work as defined in 20 CFR 404.1567(b) and 416.967(b) with additional limitations meaning, only occasional climbing ladders, ropes, or scaffolds, only occasional ramps or stairs, and only occasional stooping, crouching, kneeling, crawling. He should avoid concentrated exposure to environmental irritants, and he is limited to jobs that can be performed with monocular vision.

(R. 116.)

In doing so, the ALJ evaluated the objective medical evidence and the Plaintiff's subjective symptoms and found that the Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms but that the Plaintiff's statements concerning the intensity, persistence, and limiting effects of the symptoms were not fully supported prior to April 26, 2014. (R. 114.) While the ALJ acknowledged that the Plaintiff had severe impairments prior to that date, she indicated that the doctors had "generally reported normal observations." (*Id*.) For example, on December 18, 2012, the Plaintiff underwent surgery for repair of his left tibial plateau fracture. (R. 115.) The ALJ noted that a January 29, 2013, x-ray revealed that the bony fragments in the Plaintiff's knee were in "good alignment" with evidence of healing and minimal degenerative changes. (*Id*.) She pointed to a follow-up visit on February 19, 2013, where he self-reported that he was "doing fine" and the doctor noted that he was doing well post-fracture.[1] (R. 115.) Several days prior to that visit, a doctor observed that the

---

[1] The ALJ failed to note that, at that same February 19, 2013, visit, the Plaintiff complained that his "knee still hurts some and it swells," that he was ambulating with a cane, that he was urged to follow gentle range-of-motion exercises, and that the medical personnel noted left knee swelling and moderate pain

Plaintiff had normal respiration, normal musculature with no skeletal tenderness or joint deformity, and no edema or cyanosis. (*Id*.) Approximately one year later, a physician noted that the Plaintiff had no cyanosis, clubbing, or edema.[2] (*Id*.) According to the ALJ, these observations along with the Plaintiff's assertion that he was "doing fine" called into question the severity of the Plaintiff's allegations regarding his left knee impairment.[3] (*Id*.)

Additionally, the ALJ described the record as containing "inconsistencies" prior to April 26, 2014, with regard to the Plaintiff's breathing impairments. (*Id*.) She noted that on February 15, 2014, the Plaintiff visited the Jasper County Hospital for exertional dyspnea that had been present for approximately one week; according to the ALJ, the doctor observed that the Plaintiff was "only in mild respiratory distress," and he "diagnosed an acute COPD exacerbation."[4] (*Id*.) The ALJ also acknowledged that the Plaintiff was diagnosed with emphysema,[5] but she found

---

[2] with motion upon physical examination. (R. 377–78.) The assessment by the doctor that the Plaintiff was "doing well" post-surgery was from a visit on February 14, 2013. (R. 385.)

[2] The Plaintiff had presented to the Jasper County Hospital for shortness of breath. (R. 1182–84.)

[3] As pointed out by the Plaintiff, the ALJ failed to acknowledge that the same physician who had reported that the Plaintiff was originally "doing well" in mid-February 2013 post-surgery, also noted on June 10, 2013, that he was experiencing limited mobility and walked with a cane. (R. 343.) Moreover, the ALJ did not discuss the records of the Plaintiff's physical therapist who noted in April of 2013 that the Plaintiff had foot/knee pain and swelling and also that, while the Plaintiff's range-of-motion was improving in flexion, his "foot intrinsics [were] getting weak." (R. 352–54.)

[4] The doctor ordered a chest x-ray which showed "bilateral patch infiltrates, small pleural effusions, advanced COPD, and pulmonary fibrosis, reactive lymphadenopathy, and nonspecific 7 mm nodule in the right upper lobe." (R. 1183.) In addition to COPD acute exacerbation, the doctor also diagnosed the Plaintiff with shortness of breath, dyspnea, bilateral infiltrates, bilateral pneumonia, and hypokalemia. (*Id*.) The ALJ did not discuss this evidence in her decision.

[5] The CT imaging records cited to by the ALJ reflect "[m]oderately severe emphysema" plus bilateral patchy infiltrates, small pleural effusions, advanced COPD, and pulmonary fibrosis. (R. 1220.) The report also notes that there were "[a]ir space opacities throughout both lungs which may reflect pulmonary edema or pneumonia." (R. 1222.)

his admission that he had been "smoking a lot" undermined the severity of the Plaintiff's allegations pertaining to his breathing impairments. (*Id*.)

Conversely, the ALJ found that the Plaintiff's allegations regarding his symptoms were consistent with the evidence beginning on April 26, 2014; in making this determination, the ALJ relied primarily on the Consultative Examination performed by Andrew J. Koerber, M.D. (Dr. Koerber) on that date. (R. 116.) Dr. Koerber noted that the Plaintiff complained of shortness of breath due to COPD and leg pain, and, upon examination, he observed an antalgic gait and shortness of breath upon exertion. (*Id*.) Dr. Koerber diagnosed the Plaintiff with COPD/emphysema, left leg fracture, and decreased visual acuity in his right eye. (*Id*.) The ALJ noted that the Plaintiff was diagnosed with a cataract in his right eye as a child and could only see shadows out of it; vision in his left eye was good with the use of glasses. (*Id*.)

With regard to the opinion evidence, the ALJ afforded Dr. Koerber's opinion that the Plaintiff could sit and stand for no more than two hours at a time and up to five hours in a workday "significant, but not great weight" because the ALJ did not "precisely" adopt it. (R. 117.) The ALJ noted that she "agree[d] that the claimant is limited with standing throughout an 8-hour workday," but did not expand upon the precise limitation she believed was warranted. (*Id*.) The ALJ also gave the state agency physicians "significant, but not great weight," noting that as of April 26, 2014, she agreed that the "evidence supports light work activity" but that she considered additional evidence including the Plaintiff's testimony and did not "precisely" adopt the state agency opinions either. (*Id*.)

At step four, the ALJ must determine whether the claimant has the RFC to perform his past relevant work. §§ 404.1520(f), 416.920(f). In this case, the ALJ found that the Plaintiff had past relevant work as a construction worker (heavy per the DOT but medium as performed), a

heating and air-conditioning installer-servicer helper (heavy per the DOT and as performed), a maintenance mechanic (heavy per the DOT and as performed), and a house repairer (medium per the DOT but light/medium as performed). (R. 118.) The ALJ concluded that the Plaintiff was able to perform his past relevant work as a construction worker I (DOT 869.664–014) and a house repairer (DOT 869.381–010) prior to April 26, 2014, because the findings were "supported by the testimony of the vocational expert at [the] hearing." (*Id.*) However, beginning on that date, the ALJ determined that the Plaintiff's RFC prevented him from being able to perform any past relevant work because the demands of those jobs exceeded the post-April 26, 2014, RFC; additionally, based on the VE's testimony, the ALJ found that the Plaintiff did not have any transferable skills. (R. 118–19.)

Finally, at the last step of the sequential analysis, the ALJ must determine whether the claimant is able to make an adjustment to any other work. §§ 404.1520(g), 416.920(g). Relying on the VE's testimony, the ALJ concluded that "[s]ince April 26, 2014, considering the claimant's age, education, work experience, and residual functional capacity, there are no jobs that exist in significant numbers in the national economy that the claimant can perform." (R.119.) Thus, the ALJ found that the Plaintiff was not disabled prior to April 26, 2014, but became disabled on that date; the ALJ also found that the Plaintiff was not under a disability within the meaning of the Social Security Act at any time through December 31, 2013, the date he was last insured.

## STANDARD OF REVIEW

The decision of the ALJ is the final decision of the Commissioner when the Appeals Council denies a request for review. *Liskowitz v. Astrue*, 559 F.3d 736, 739 (7th Cir. 2009). The

Social Security Act establishes that the Commissioner's findings as to any fact are conclusive if supported by substantial evidence. *See Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995). Thus, the Court will affirm the Commissioner's finding of fact and denial of disability benefits if substantial evidence supports them. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2009). Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *Henderson v. Apfel*, 179 F.3d 507, 512 (7th Cir. 1999).

It is the duty of the ALJ to weigh the evidence, resolve material conflicts, make independent findings of fact, and dispose of the case accordingly. *Richardson*, 402 U.S. at 399–400. The reviewing court reviews the entire record; however, it does not substitute its judgment for that of the Commissioner by reconsidering facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility. *See Diaz*, 55 F.3d at 608. A court will "conduct a critical review of the evidence," considering both the evidence that supports, as well as the evidence that detracts from, the Commissioner's decision, and "the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues." *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003) (internal quotations omitted).

When an ALJ recommends the denial of benefits, the ALJ must first "provide a logical bridge between the evidence and [his] conclusions." *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009) (internal quotation marks and citation omitted). Though the ALJ is not required to address every piece of evidence or testimony presented, "as with any well-reasoned decision, the ALJ must rest its denial of benefits on adequate evidence contained in the record and must explain why contrary evidence does not persuade." *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008).

However, if substantial evidence supports the ALJ's determination, the decision must be affirmed even if "reasonable minds could differ concerning whether [the claimant] is disabled." *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

## ANALYSIS

As noted above, the Plaintiff argues that the Commissioner erred by: (1) failing to include limitations from all impairments in her hypothetical to the VE; and (2) failing to properly weigh the opinion evidence of Dr. Koerber. Specifically of relevance, the Plaintiff contends that the ALJ elicited no testimony and/or evidence from the VE that an individual limited to a medium exertional level and monocular vision could perform the Plaintiff's past relevant work and did not adequately explain why additional exertional limitations related to the Plaintiff's COPD were required on April 26, 2014, but not before that date. The Government, on the other hand, contends that the ALJ properly relied on the VE's testimony that the Plaintiff could return to his past relevant work and that the RFC findings were supported by substantial evidence. The Government is mistaken.

### A.    The ALJ's Step Four Analysis

"RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." SSR 96–8p. In crafting a particular RFC for a claimant, an ALJ must first identify that person's restrictions and/or functional limitations. *Id*. In doing so:

> the ALJ must consider all of the relevant evidence in the record, even limitations that are not severe, and may not dismiss a line of evidence contrary to the ruling. However, a determination need not contain a complete written evaluation of every piece of evidence.

*Murphy v. Colvin*, 759 F.3d 811, 817 (7th Cir. 2014) (quotation marks, brackets, and citations omitted). The combination of a claimant's impairments "might well be totally disabling" even if each of the claimant's impairments standing alone is not serious. *Martinez v. Astrue*, 630 F.3d 693, 698 (7th Cir. 2011). An ALJ's "failure to fully consider the impact of non-severe impairments requires reversal." *Denton v. Astrue*, 596 F.3d 419, 423 (7th Cir. 2010) (citing *Golembiewski v. Barnhart*, 322 F.3d 912, 918 (7th Cir. 2003)).

It is only appropriate to express RFC in terms of exertional work levels—i.e., sedentary, light, medium, heavy, and very heavy—after the ALJ has evaluated the claimant's abilities related to work on a function-by-function basis. SSR 96-8p. Once that evaluation is complete, the ALJ moves on to consider whether the claimant retains the ability to do his or her past relevant work. *Id.* "Past work can mean two things: (1) the actual functional demands of a particular job that the claimant performed or (2) the functional demands and job duties of such an occupation as it is generally found in the national economy." *Gotz v. Barnhart*, 207 F. Supp. 2d 886, 896 (E.D. Wis. 2002) (citing *Veal v. Bowen*, 833 F.2d 693, 697 (7th Cir. 1987)). At this stage, the ALJ must initially determine whether the individual can do past work as he or she actually performed it and then whether a claimant can perform his or her past relevant work as it is generally done in the national economy. SSR 96-8p. If a VE testifies that a claimant can perform his or her past relevant work as it was actually performed, the listings in the DOT— which correlate to the universal functions of the occupation—are not relevant. *Hernandez v. Astrue*, No. 07–2161, 277 Fed. Appx. 617, 624 (7th Cir. May 13, 2008) (citing *Jens v. Barnhart*, 347 F.3d 209, 213 (7th Cir. 2003)).

The Seventh Circuit has held that an ALJ cannot simply describe past relevant work in a "generic way" and then conclude, based on the claimant's RFC, that he is able to return to that

work. *Nolen v. Sullivan*, 939 F.2d 516, 518 (7th Cir. 1991) (citing *Strittmatter v. Schweiker*, 729 F.2d 507 (7th Cir. 1984). "Instead, the ALJ must list the specific physical requirements of the previous job and assess, in light of the available evidence, the claimant's ability to perform these tasks." *Id.*; *see also* SSR 82–62 ("Past work experience must be considered carefully to assure that the available facts support a conclusion regarding the claimant's ability or inability to perform the functional activities required in this work.").

Here, after eliciting testimony from the Plaintiff with regard to his work history and alleged impairments, the ALJ asked the VE to describe the Plaintiff's past work both as actually and generally performed. (R. 50.) In response, the VE listed the names of the jobs from the DOT along with their exertional classifications, and then the ALJ asked the VE a single hypothetical:

> Q: Okay. And I'd like you to assume that the Claimant has the residual functional capacity to perform at the light exertional level, occasional ladders, ropes, and scaffolds, occasional ramps and stairs, occasional stooping, kneeling, crouching, and crawling. And he should avoid concentrated exposures to environmental irritants, and then he is limited to jobs that can be performed with monocular vision.
> A: So no depth perception?
> Q: On one side. Remember he's just got—it's been—
> A: Well, he really needs both eyes.
> Q: Well, he's been working all his life—
> A: All right. Okay.
> Q: —with one.
> A: One side?
> Q: Yeah, he's got—he's got—you know, one side he's got vision; the other side he doesn't.
> A: So his one side—is that the right? It doesn't really matter which—
> Q: It doesn't matter, no. I mean it—he's—
> A: —side of [INAUDIBLE]—
> Q: —worked with it all his life. And I know I have given this RFC before so I know it's—some jobs it really matter. Other jobs I know it doesn't.
> A: Well, if they're driving it does—
> Q: Yeah.
> A: —for fork lifts—
> Q: Yeah.
> A: —or something like that.
> Q: Yeah.
> A: Okay.

(R. 50–52.) Based on this hypothetical, the VE confirmed that the Plaintiff would not be able to perform any past relevant work and that he had no transferable skills. (R. 52-54.) Ultimately, however, the ALJ determined that the Plaintiff *was* able to perform his past relevant work as a construction worker I (as actually performed) and as a house repairer (as actually and generally performed) prior to April 26, 2014. (R. 118.) In doing so, the ALJ stated that she had compared the Plaintiff's pre-April 26, 2014, RFC "with the physical and mental demands of this work" and that the "findings [were] supported by the testimony of the vocational expert at the hearing." (*Id*.)

The ALJ's analysis at step four was deficient. As pointed out by the Plaintiff, the ALJ never asked the VE a hypothetical that incorporated the RFC she ultimately assigned to the Plaintiff prior to April 26, 2014. Generally, if an ALJ chooses to rely on VE testimony, the hypothetical question posed should reflect the relevant limitations supported by the record. *See Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004).[6] Here, the ALJ's hypothetical focused solely on light work with additional limitations—no mention was made of an individual performing at the medium exertional level in the hypothetical. The VE opined that the Plaintiff would not be able to perform his past relevant work if restricted to light labor, but he never offered any opinion on whether the Plaintiff could perform his past relevant work if it involved medium level exertion with monocular vision, likely because he was never asked about it. There

---

[6] An exception exists when it is apparent that the VE was familiar with all of the claimant's limitations—despite a flawed hypothetical—because the VE had "independently reviewed the medical record or heard testimony directly addressing those limitations.". *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 619 (7th Cir. 2010). Here, the ALJ asked the VE whether he needed additional information about the Plaintiff's "vocational background" before testifying, and the VE indicated that he did not. (R. 50.) This testimony seems to suggest that the VE had prior access to the Plaintiff's work history, but there is no evidence that the VE independently reviewed the medical record. Additionally, for the reasons discussed below, the hearing testimony was insufficient to trigger the *O'Connor-Spinner* exception.

was simply no direct testimony by the VE—let alone testimony that could be regarded as substantial evidence—that would support the ALJ's contention that someone limited to medium work and monocular vision could perform the Plaintiff's past relevant work. Considering the ALJ specifically stated in her decision that she had relied on the VE's testimony to support this finding, her analysis was flawed and the decision lacked a substantial evidentiary basis at step four. *See Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003) (an ALJ's decision cannot stand "if it lacks evidentiary support or an adequate discussion of the issues").

A reading of the hearing testimony does nothing to rectify this error. When asked about his time at "New Directions" in 2001, the Plaintiff testified that it was a substance abuse clinic where he had spent three months receiving treatment. (R. 28–29.) He testified that he "wasn't really an employee"[7] but helped making pallets at the pallet factory by "nail[ing] them together," lifting them, and stacking them up before they were moved by forklifts. (R. 29–30.) Each pallet weighed approximately forty pounds. (R. 29.) Based on this testimony alone,[8] the VE classified this job as a construction worker I (DOT 869.664-014),[9] which is heavy and semi-skilled per the

---

[7] The earnings statement in the record appears to show that $6,210.93 was credited but then subtracted from the Plaintiff's earnings, leaving $2,070.31 from New Directions, Inc. for 2001. (R. 224.)

[8] The position is not referenced at all on the Plaintiff's Work History Report. (R. 247.)

[9] The construction worker position is defined, in relevant part, as:

> **869.664–014 CONSTRUCTION WORKER I (construction)**
> Performs any combination of following duties on construction projects, usually working in utility capacity, by transferring from one task to another where demands require worker with varied experience and ability to work without close supervision: Measures distances from grade stakes, drives stakes, and stretches tight line. Bolts, nails, aligns, and blocks up under forms. Signals operators of construction equipment to facilitate alignment, movement, and adjustment of machinery to conform to grade specifications. Levels earth to fine grade specifications, using pick and shovel. Mixes concrete, using portable mixer. Smooths and finishes freshly poured cement or concrete, using float, trowel, or screed. Positions, joins, aligns, and seals pipe sections. Erects scaffolding, shoring, and braces. Mops, brushes, or spreads paints or bituminous compounds over surfaces for protection. Sprays materials such as water, sand, steam, vinyl, paint, or

DOT but medium as performed according to the VE. (R. 50–51.) However, it is not clear what

details of the Plaintiff's job shifted it from heavy to medium work in the VE's estimation. This is

troublesome because the regulations state that cases focused on past relevant work as a deciding

factor must contain enough documentation and/or information about it to permit a logically-

based decision on the matter:

> Adequate documentation of past work includes factual information about those
> work demands which have a bearing on the medically established limitations.
> Detailed information about strength, endurance, manipulative ability, mental
> demands and other job requirements must be obtained as appropriate. This
> information will be derived form [sic] a detailed description of the work obtained
> from the claimant, employer, or other informed source.

SSR 82–62; *see also Nolen*, 939 F.2d at 519 ("We reiterate that the ALJ must specify the duties

involved in a prior job and assess the claimant's ability to perform the tasks.") Particularly

relevant in this case—yet not addressed—is the frequency with which the Plaintiff was required

to move, lift, carry, and stack the forty-pound pallets.[10] Although the VE described this work as

---

stucco through hose to clean, coat, or seal surfaces. Applies caulking compounds by hand
or with caulking gun to seal crevices. Grinds, sands, or polishes surfaces, such as
concrete, marble, terrazzo, or wood flooring, using abrasive tools or machines. Performs
variety of tasks involving dextrous use of hands and tools, such as demolishing buildings,
sawing lumber, dismantling forms, removing projections from concrete, mounting pipe
hangers, and cutting and attaching insulating material. Work is usually performed with
other workers.
. . .
GOE: 05.10.01 STRENGTH: H GED: R3 M3 L3 SVP: 4 DLU: 88

http://www.govtusa.com/dot; *see also* DICOT 869.664–014, 1991 WL 687601 (January 1, 2016). This
job listing has specific vocational preparation of over three months and up to six months, and it requires
frequent near acuity, occasional far acuity, and frequent depth perception. *Id.*

[10] Also relevant for similar reasons—but again not addressed—is the amount of time the Plaintiff was
required to stand, walk, squat, or kneel during the day while working at the pallet factory for New
Directions, Inc. The lack of discussion is concerning because medium work generally requires standing or
walking for a total of approximately six hours "in order to meet the requirements of frequent lifting or
carrying objects weighing up to 25 pounds" and also requires flexibility of the knees. SSR 83-10. In this
case, Dr. Koerber opined that the Plaintiff would have "difficulty performing activities involving standing
or moving about for long periods (for no more than 2 hours at any one time or more than 5 hours total in
an 8 hour work day) or kneeling/squatting" based on his knee issue. (R. 1246.) As pointed out by the

"medium" as performed, if frequent lifting and carrying of the pallets was necessary, the VE's characterization of the job—and the ALJ's apparent reliance on it—was questionable considering medium work generally limits frequent lifting and carrying to those objects weighing up to twenty-five pounds. 20 C.F.R. §§ 404.1567(c), 416.967(c). Heavy work, on the other hand, involves frequent lifting or carrying of objects weighing up to fifty pounds. 20 C.F.R. §§ 404.1567(d), 416.967(d). The frequency with which an individual is required to lift or carry the objects is often more important than the ability to lift the maximum weight. *See* SSR 83–10. Here, neither the VE nor the ALJ addressed this critical distinction at the hearing. The written decision does not offer additional information related to the necessities of the Plaintiff's work at New Directions, Inc., nor does it assess the Plaintiff's current ability to perform its specific tasks. Rather, it simply lists the job title, states that the work "did not require the performance of work-related activities precluded by the claimant's" pre-April 26, 2014, RFC,[11] and concludes that the findings were supported by the VE's testimony. Because the VE did not testify that the Plaintiff could perform his past relevant work as a construction worker I or provide additional details related to that job, it must be assumed that the aforementioned testimonial support the ALJ was referring to was the VE's general classification of the work as performed being "medium." However, the Seventh Circuit has made it clear that reliance on such generic terminology is insufficient. *See Smith v. Barnhart*, 388 F.3d 251, 252 (7th Cir. 2004) (ALJ erred when equating the claimant's past relevant work to sedentary work in general without considering whether she

---

Plaintiff, the ALJ stated she agreed—albeit not "precisely"—with Dr. Koerber that the Plaintiff is "limited with standing throughout an 8-hour workday," yet she failed to assess any particular limitations on standing in either the pre or post April 26, 2014, RFC. (R. 117.)

[11] As noted above, the ALJ found that, prior to April 26, 2014, the Plaintiff was able to perform work at the medium exertional level with an additional limitation of monocular vision. (R. 114.)

could perform the duties of the specific jobs she had held); *Nolen*, 939 F.2d at 519 (remand appropriate because the ALJ's decision did not list the demands involved in the claimant's previous job or assess the claimant's ability to perform them); *Kenefick v. Astrue*, 535 F. Supp. 2d 898, 908–09 (N.D. Ill. 2008) (citing *Cohen v. Astrue*, 258 Fed. Appx. 20, 28, 2007 WL 4437229, at *8 (7th Cir. 2007) ("[A]n ALJ cannot describe a previous job in a generic way, e.g., 'sedentary,' and on that basis conclude that the claimant is fit to perform all sedentary jobs without inquiring into any differences in what the job requires while sitting.")); *Cain v. Astrue*, No. 10 C 6849, 2011 WL 6734508, at *8 (N.D. Ill. Dec. 21, 2011) (while the claimant testified at the hearing regarding some details of her position, "the ALJ's failure to address that testimony in his opinion leaves [the court] unable to assess whether the ALJ did in fact comply with the requirements of SSR 82–62"); *Strocchia v. Astrue*, No. 08 C 2017, 2009 WL 2992549, at *19 (N.D. Ill. Sept. 16, 2009) (finding the ALJ's comparison between the demands of the claimant's past work and existing capabilities "superficial and insufficient"). Thus, for the reasons set forth above, the Court cannot trace the ALJ's logic when she determined that the Plaintiff was capable of performing his past relevant work as a construction worker I as it was actually performed.

The hearing testimony related to the Plaintiff's work with Steve's Specialized Services suffers from similar problems. When asked what he did for Steve's Specialized Services, the Plaintiff testified that he "did the plumbing" and that the company in general "did a lot of construction work and, you know, remodeling." (R. 30.) The ALJ rephrased this testimony and asked whether the Plaintiff was a "general laborer" for them, to which the Plaintiff responded, "Yeah. Yes." (R. 31.) The Plaintiff indicated that he could "probably maybe" lift up to thirty pounds of pipe and supplies at the most and would sometimes need help doing that. (*Id*.) When asked why he did not continue working there after a few months, he stated it was because he just

"couldn't do it." (R. 32.) This is consistent with what Plaintiff submitted on his Work History Report that lists the job as a "handyman" but contains no details whatsoever related to that position except that he was "let go from this job because I did not perform well enough." (R. 247–48.) Based on this testimony, the VE classified the job as a house repairer (DOT 869.381– 010),[12] which is medium per the DOT and light to medium as performed according to the VE. (R. 51.) Neither the VE nor the ALJ discussed the details of this work, which is problematic considering all that can be discerned from the Plaintiff's testimony is that he was a general laborer who "did the plumbing" and had trouble lifting the required amount. There was no indication either during the hearing or in the written decision as to how frequently the Plaintiff was required to lift the thirty-pound items or how often he needed help doing so—this lack of discussion or analysis raises the same questions noted above. *See* 20 C.F.R. §§ 404.1567(c), 416.967(c). Again, with regard to the house repairer job as it was actually performed, the ALJ's reference to testimonial support offered by the VE must be to the exertional category he assigned to it, which provides an insufficient basis on which to rely. *See* SSR 82–62; *Smith*, 388 F.3d at 252; *Nolen*, 939 F.2d at 519.

---

[12] According to the DOT, the referenced house repairer position is defined as follows:

> **869.381–010 HOUSE REPAIRER (construction)**
> Repairs and remodels houses and small buildings, according to blueprints or oral instructions: Measures distances and marks reference points on existing structure to lay out work. Removes defective members, existing siding, sheathing, and trim, using pinch bar, portable power saw, hammer, and other carpenter's handtools. Cuts lumber to size and shape, using hand or portable power saw. Nails and screws new framework, sheathing, and trim in place. Fills cracks and other defects in plaster or plasterboard with patching plaster, using trowel. Sands plaster patch after drying to match existing surface. Paints interior and exterior surfaces to specified color and texture. Replaces or installs new electrical fixtures, plumbing hardware, and brickwork, using pliers, screwdrivers, wrenches, and trowel.
> GOE: 05.10.04 STRENGTH: M GED: R4 M3 L3 SVP: 7 DLU: 77

http://www.govtusa.com/dot; *see also* DICOT 869.381–010, 1991 WL 687582 (January 1, 2016). This job listing has specific vocational preparation of over two years and up to four years, and it requires frequent near and far acuity plus frequent depth perception. *Id*.

The ALJ also found that the Plaintiff retained the RFC to perform this past relevant work as it is generally required by employers throughout the national economy. The Seventh Circuit has recognized that it is not necessary for the ALJ to determine that a claimant can return to the "precise job" he previously held if evidence shows he can return to a "'job' he held that exists at other employers." *Smith*, 388 F.3d at 253. However, that job may not be described "so broadly as to encompass a range of physical and mental abilities some of which the applicant may not have." *Id*. Here, in addition to the work being described only broadly in terms of functionality and exertional limitations, the reference to the DOT listing raises its own set of questions. As set forth in footnote twelve, the DOT number assigned to the house repairer position describes various tasks associated with remodeling and repairing houses and small buildings. *See* http://www.govtusa.com/dot; *see also* DICOT 869.381–010, 1991 WL 687582 (January 1, 2016). Of note, the DOT states that this job requires frequent near and far acuity plus frequent depth perception. *Id*.

There is no question that the record contains evidence of the Plaintiff's vision issues, which the ALJ acknowledged by limiting him to monocular vision.[13] Yet, the hearing testimony that took place immediately after the ALJ posed her single hypothetical to the VE highlights the problem with the lack of specificity in the ALJ's analysis. When asked by the ALJ whether the Plaintiff could perform any of his past relevant work if limited to light exertion plus additional

---

[13] The Plaintiff testified that he had been blind in his right eye since birth due to a cataract and that he could just see shadows out of it, but the ALJ cut off the Plaintiff's response before he could testify further. (R. 35–36.) There is no indication that the VE was aware of the precise medical evidence from Dr. Koerber pertaining to the Plaintiff's right eye—specifically, Dr. Koerber noted that the Plaintiff had "[d]ecreased visual acuity" and "severe decreased peripheral visual fields in his right eye by confrontation." (R. 1245–47.) Dr. Koerber recommended a "formal ophthalmologic evaluation" to garner additional information, but the record does not show that such an examination was performed. (R. 1247.)

limitations including monocular vision,[14] the VE initially probed the significance of the depth

perception issue and indicated that "he really needs both eyes." (R. 52.) The ALJ pushed back

and pointed out that she had given the same RFC in previous cases and knew that it "really

matter[ed]" with some jobs but not others; she also stressed that the Plaintiff had been working

with monocular vision his whole life. (*Id*.) Without additional elaboration or clarification, the VE

then testified that the question of monocular vision could be relevant if a job required driving,

forklifts, "or something like that." (*Id*.) Such vague testimony without reference to the functions

of the specific job at issue creates an evidentiary gap that the ALJ failed to fill in her written

decision. *See, e.g*., *Getch v. Astrue*, 539 F.3d 473, 481–82 (7th Cir. 2008) (the ALJ's findings

were not sufficient to build a logical bridge to the conclusion because the ALJ failed to expressly

discuss whether an environmental limitation was typical for the job at issue or whether it

represented a departure from the norm when considering whether the claimant could return to his

past relevant work); *Kenefick*, 535 F. Supp. 2d at 909 (noting that the VE displayed difficulty in

ascertaining the exact skills involved in the claimant's past work and the ALJ's decision failed to

satisfy the *Nolen* standard because it did not provide facts about the claimant's previous duties or

her current ability to perform them).

     To the extent the testimony seems to suggest that the ALJ relied on the Plaintiff's ability

to have worked "all his life" with vision in only one eye, the Court agrees with the Plaintiff that

this fact does not save the ALJ from error. The Seventh Circuit has made it clear that

"employment is not proof positive of ability to work, since disabled people, if desperate (or

employed by an altruist), can often hold a job. One can be unemployable yet employed." *Wilder*

*v. Apfel*, 153 F.3d 799, 801 (7th Cir. 1998) (internal citations omitted). This is especially true

---

[14] Remember, the ALJ never posed any hypothetical to the VE that limited the Plaintiff to medium work.

where, as here, there is evidence in the record that the Plaintiff was not actually able to sustain the work at the level required or—in the case of the construction worker I job—was given work through a rehabilitation program. *See id*.

Finally, the Court notes that the ALJ's error at step four cannot be considered harmless because she did not go on to conduct an analysis at step five as to whether the Plaintiff was able to perform any other jobs in the national economy. *Getch*, 539 F.3d at 481–82. Overall, the Court finds that the lack of analysis and discussion at step four makes it impossible to trace the ALJ's logic in deciding that the Plaintiff was capable of performing his past relevant work as a construction worker I and house repairer prior to April 26, 2014. Because the ALJ did not build an accurate and logical bridge from the evidence to her conclusions, remand is required on this issue, and the Court need not address the remainder of the parties' arguments. *See Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005) (a decision cannot stand if it "lacks evidentiary support or an adequate discussion of the issues" and an ALJ must "explain his analysis of the evidence with enough detail and clarity to permit meaningful appellate review") (citations omitted).[15]

---

[15] On remand, the ALJ is directed to take a fresh look at the evidence. In addition to the issues explicitly addressed in this Opinion and Order, the ALJ should also review the evidence and documentation related to the complete range of the Plaintiff's physical and mental impairments. The ALJ must ensure that all appropriate limitations are included in the hypothetical(s) posed to the VE and that the RFC determination for both pre and post April 26, 2014, is supported by substantial evidence. *See, e.g., Murphy*, 759 F.3d at 817; *Golembiewski v. Barnhart*, 322 F.3d 912, 918 (7th Cir. 2003) (aggregate effect of all impairments—both severe and non-severe—must be considered); *see also Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009) ("The ALJ's cursory analysis does not give us confidence that he had appropriate reasons for rejecting the limitations [the claimant] alleged."). Of particular relevance is the evidence described in footnotes one through five above.

## CONCLUSION

For the reasons stated above, the Court REVERSES and REMANDS this case for further proceedings in accordance with this Opinion and Order.

SO ORDERED on December 5, 2018.

 s/ Theresa L. Springmann
CHIEF JUDGE THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT
